[Civ. No. 7445. Fourth Dist. Oct. 29, 1965.]

MAURICE EMILE BEAUREGARD, Plaintiff and Appellant, v. WILLIAM H. WINGARD et al., Defendants and Respondents.

James Schwartz and Edward L. Lascher for Plaintiff and Appellant.

McInnis, Focht & Fitzgerald and James L. Focht for Defendants and Respondents.

STONE, J.*— This being an appeal from a judgment entered pursuant to a motion for nonsuit, not only must we

*Assigned by the Chairman of the Judicial Council.

view the evidence in the light most favorable to appellant, but we must also indulge every reasonable inference and every reasonable intendment in his favor in determining whether there is substantial evidence that would support a verdict in appellant's favor. (*Meyer* v. *Blackman,* 59 Cal.2d 668, 671 [31 Cal.Rptr. 36, 381 P.2d 916].) The following statement of facts accords with this doctrine.

Appellant has resided with his wife and two children in the City of Oceanside since 1940. He and his wife have conducted a retail mosaic and ceramic tile business in a store building located in the commercial area of the city. Appellant also has installed murals and ceramic tile. In 1960 he was an unsuccessful candidate for the office of city councilman. During the campaign he complained to the city manager about the political activities of Police Chief Wingard and some of his officers who actively supported his opponent.

On the afternoon of August 30, 1961, appellant was arrested for bookmaking by respondent Michel, a police officer of Oceanside. On the day of the arrest, appellant went to work in the morning, had coffee with his wife at 11 a.m., and then went home to change clothes to go to the races at Del Mar. He returned to the store, parked in a lot at the rear, and noticing Officer Michel in the area, waved to him.

Once inside the store, appellant's wife informed him that a stranger was waiting to see him. The stranger, Deputy Sheriff Cowley dressed in civilian clothes, represented himself to be a friend and employee of one Jimmy Cusenza, whom appellant knew. Cowley asked appellant if he were going to the track, and appellant answered, "Yes." Cowley then asked appellant to place a $10 bet for him on "Ole Snuggler" in the fifth race. Appellant replied that he had two passes, and invited Cowley to come along. Cowley said "No," he had to work. Appellant then gave Cowley a slip of paper, and his testimony concerning the transaction is: "So, I said, 'Well, there is a piece of paper. And you mark down what you want because I don't know you, and you don't know me.' So he wrote it down." Appellant told Cowley to come back in the morning and either get his winnings or the cancelled tickets. Appellant once again said he had two tickets and invited Cowley to come along, but Cowley declined, and walked toward the front door.

Appellant walked to the rear door when, according to his testimony, the following occurred: "I opened the back door. And there was Officer Michels right there. And he said, 'You are under arrest.' And I looked up at him and I said, 'Mike,

for what?' He said, 'You are under arrest.' And showed me his badge. I said, 'No; I know who you are.' He said, 'You are under arrest.' I said, 'For what?' He said, 'For book-making.' I said, 'You are kidding.' So we was walking toward my car all of that time, so when we got up there, he says, 'You are under arrest. I have to take you in.' So by that time he started kind of tapping on my pockets. I said, 'What are you looking for?' He said, 'The money you are taking to the track.' So again I said, 'Mike, you are kidding.'

"And by that time, I said to him, 'Don't search me in the alley here. I feel that I am a respectable citizen of Oceanside here. Let's go back to the store and I will do anything you want.' And about that time I looked up the alley and I saw Mr. Michels—I mean Mr. Cowley, coming down. And at that time when he come close to us, he began trotting and he pointed to Mike and he said, 'He has got it.' So then we went to the store . . ."

A search of appellant's trousers revealed the marked ten dollar bill he had received from Cowley. The two officers searched appellant's desk and cash register, and then Officer Michel said: "Well, come on, Frenchie, . . . The chief told me to arrest you."

Since the chief was not present, it could be inferred that the order to arrest appellant was given by the chief before the officers went to appellant's place of business.

Appellant was booked for violation of Penal Code section 337a, subdivision 3, which provides that every person is guilty of a criminal offense: "Who, whether for gain, hire, reward, or gratuitously, or otherwise, receives, holds, or forwards, or purports or pretends to receive, hold, or forward, in any manner whatsoever, any money, thing or consideration of value, or the equivalent or memorandum thereof, staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever; . . ."

Chief Wingard entered the station after the booking, and appellant testified the following occurred: "So at the end of the conversation, I heard the Chief—Mr. Wingard—say, 'Book the son-of-a-bitch for felony.' So, Mike walked over to me and he said, 'I have got to change your booking.' I said, 'Gee, I

heard.' So he left. And then this Chief came walking towards me. And he said, 'Frenchie, didn't you know the man I sent in the store there?' I said, 'No, I never seen him in my life.' He said, 'Well, I set it up.' Then, we kept passing back and forth, both of us. He said, 'You know now you have got a record.' ''

Prior to the arrest, neither Officer Michel nor Officer Cowley had any information that would lead them to suspect appellant was engaged in any criminal activity. Chief Wingard's ''personal investigation'' consisted of taking a walk in front of appellant's place of business two or three times and observing to see if he recognized anyone going in or out. On one occasion he observed Jimmy Cusenza leaving the store. Although the chief thought Cusenza at one time had been a bookmaker, he had no such knowledge.

Neither the chief of police, the undercover agent he sent to have appellant make a bet, nor the officer who actually arrested appellant, had any knowledge either from their own observations or from an informer that appellant had engaged in bookmaking, or for that matter that he had engaged in criminal activity of any character prior to the time of arrest. Furthermore, respondent Michel, who made the arrest at the rear of appellant's store, had no knowledge of what occurred within the store and no ground for suspecting that appellant had committed any crime, either misdemeanor or felony, until after the arrest was completed and the undercover agent came around the building and told Michel that ''He has got it.''

Thus, viewing the facts most favorably to appellant, not only was the arrest made without a warrant, but it was made without reasonable or probable cause.

Respondents justify the arrest by the provisions of Penal Code section 836. This section provides: ''A peace officer may make an arrest in obedience to a warrant, or may, without a warrant, arrest a person:

''1. Whenever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence.

''2. When a person arrested has committed a felony, although not in his presence.

''3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed.''

Since Officer Michel had no cause to believe appellant had committed a public offense, as provided in either subdivisions

1 or 3 of section 836, respondents place their reliance on subdivision 2.

Appellant argues that the prerequisite of reasonable or probable cause applies to subdivision 2 by implication. He cites a number of cases but relies chiefly upon *People* v. *Brown,* 45 Cal.2d 640, 643 [290 P.2d 528]. In *Brown,* however, the court was specifically concerned with the admissibility of evidence secured by a search pursuant to an unlawful arrest. In that posture the court deemed it "unnecessary to determine whether a requirement of reasonable cause applies by implication to subdivision 2 of section 836." As respondents point out, the court said, in a footnote: "This question would be presented directly if a guilty felon sued an officer for false arrest on the ground that the officer had no reasonable cause to believe him guilty . . . ."

In a subsequent case, *People* v. *Ketchel,* 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394], the court quoted the following from *People* v. *Dupee,* 151 Cal.App.2d 364, 366, at page 526 [311 P.2d 568]: " '[A]n arrest will not be held to have been validly made even though the arrested person was guilty of having committed a felony unless the arresting officer had reasonable grounds as a basis for making the arrest.' "

This language would appear to square with appellant's contention, but an examination of the *Dupee* case reveals that it concerned the admissibility of evidence seized during a search made without a warrant. The language must be considered dicta since the holding of *Dupee* at page 367 is that: ". . . , there can be no doubt that they [the officers] had reasonable cause to arrest appellant, and therefore the search made was lawful and the evidence seized during the search was properly admitted into evidence."

It appears the question whether the requirement of reasonable cause for arrest without a warrant applies by implication to subdivision 2 of Penal Code section 836 has not been decided in California; certainly the question has not been determined in the posture of a civil action for unlawful arrest. We find that determination unnecessary to the disposition of this appeal because we conclude that entrapment negatived the felony upon which respondents rely to justify the arrest without reasonable cause under subdivision 2.

There can be no doubt that had the trial judge permitted the case to go to the jury, the jurors, as reasonable men and women, might have concluded that appellant was the victim of entrapment. This is so because the judge who tried the criminal case without a jury, so found. We are mindful that the

views of the court expressed in the criminal action cannot be used as evidence in this case, but we are not required to ignore his conclusions when they find their way into the record. Appellant moved at the outset of this trial to invoke the doctrine of collateral estoppel under the authority of *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal.2d 601 [25 Cal. Rptr. 559, 375 P.2d 439]. The following remarks of the trial judge were read into the record: "The law will not countenance conduct of this kind on the part of police officers or deputy sheriffs. These officers conceived the idea, executed it, forced an innocent man into a compromising position to give it the appearance of a crime that he had no intention whatever of committing. So the law will not permit me to adjudge him guilty, and I therefore find him not guilty."

We simply note the obvious, that since the trial judge found entrapment, it would not be unreasonable for jurors to likewise find there was an entrapment if the case were submitted to them.

There remains the question whether the criminal defense of entrapment is irrelevant in a civil action for unlawful arrest. Respondents argue that entrapment is merely an exculpatory defense while the felony remains a fact. We believe respondents' view of entrapment is too superficial. The matrix of an entrapment is the mind of a public official and for that reason it offends the judicial process. The courts, as a matter of public policy, hold a defendant free from the entanglements of the entire transaction; as to him all criminal implications are negated. Strange indeed would be a public policy that prevented the people from punishing a defendant for a criminal act because it originated in the mind of a public official, yet permitted the same public official to raise the act as a shield against personal liability for the wrongful arrest he engendered.

We hold that an act committed as the result of an entrapment cannot serve to justify an unlawful arrest under the provisions of Penal Code section 836, subdivision 2.

The judgment is reversed.

Brown (Gerald), P. J., and Coughlin, J., concurred.